Beveridge v. Hewitt.

## PETER H. BEVERIDGE ET AL.

### v.

## ALFRED B. HEWITT ET AL.

1.  NEW TRIALS—JURISDICTION IN CHANCERY.—If it appears that the judgment complained of is unjust, and that the party, in good faith, has used or employed the means given him by the law to assert his rights, and has been active and vigilant in his efforts to make his defense, and is prevented by accident or such circumstances as he is unable to control, equity will grant him a new trial.

2.  RULES OF COURT.—Courts of record have power to adopt rules of practice, and when established such rules have the force of law, and are obligatory upon the court as well as upon parties to causes.  While the court may at any time modify or rescind its rules, yet until it does so it must administer them according to their terms, and it has no discretion to apply them or not, according to its convenience.

3.  LACHES.—So when the rules of court require a new calendar each month, and a calendar of cases was made up for the September term according to the rules of court, the call of which was suspended and afterwards resumed at a time when the rules of court required a new calendar to be made up, and the attorney for defendants, after learning that no new calendar was to be made up gave the case no further attention for that month, and the case was called and tried in his absence and that of the defendants, the defendants are not chargeable with *laches* in failing to present their defense at the trial of said cause.

4.  GAMBLING CONTRACTS.—Contracts for the sale and delivery of a commodity at a future day, for a price certain, if made in good faith, are binding; but if made as a cover for gambling, without any intention to deliver and receive the commodity, but merely to pay and receive the difference between the price agreed upon and the market price at such future day, they are within the statute of gaming, and void.

5.  SETTLEMENT BY COUNTER-TRADES.—The fact that such contracts or sales are usually settled by counter-sales to other parties does not render them

legitimate, nor is it necessary to their invalidity to show that such other par-
ties knew they were engaged in gaming contracts. From the fact that they
were engaged in making such counter-sales according to the custom of the
Board of Trade, an intention to enter into transactions of this character will
be imputed to them.

6. PARTNERSHIP—NOT ESTABLISHED BY STATEMENTS OF ONE PARTY.—
The statements of one party that another is a partner with him in a certain
transaction, made in the absence of the other, is not evidence tending to
establish a joint liability.

APPEAL from the Circuit Court of Cook county; the Hon.
M. F. TULEY, Judge, presiding. Opinion filed May 4, 1881.

The complainants, Peter H. Beveridge and Eugene G. Mc-
Curdy, filed their bill in equity against Alfred B. Hewitt,
Aaron Bliss and Frank T. Bliss, co-partners, under the name
and style of Hewitt, Bliss & Co., and John Hoffman, sheriff
of Cook county, praying that the collection of a certain judg-
ment at law recovered by said Hewitt, Bliss & Co. against the
complainants, be enjoined; that said judgment be set aside,
and a new trial at law awarded the complainants. The cause
being heard on bill, answer, replication and proofs, a decree
was rendered dismissing the bill for want of equity. From
this decree the complainants have appealed to this court.

It appears that in June, 1879, Hewitt, Bliss & Co., who
were members of the Chicago Board of Trade, commenced a
suit in assumpsit against the complainants, in the county
court of Cook county, to recover the balance of an account for
money paid by them in settlement of sundry transactions on
the Board of Trade, in which they claim to have acted as the
agents and brokers of the complainants, and for their commis-
sions, amounting in all to $840.50. Both of the complainants
were served with process returnable to the July term, 1879,
of the county court; and shortly thereafter they retained and
employed a competent attorney, and placed the entire charge
of the defense of the suit in his hands. The declaration,
which contained only the ordinary *indebitatus assumpsit*
counts, was filed August 1, 1879, and thereupon said attorney,
on behalf of the complainants, prepared and filed the follow-
ing pleas, viz, a joint plea of *non assumpsit*, a separate plea by

Beveridge v. Hewitt.

Beveridge verified by his affidavit, denying joint liability with McCurdy, and a separate plea by McCurdy, verified by his affidavit denying joint liability with Beveridge.

At the time of the commencement and during the pendency of said suit, the following rules of practice, adopted by the county court and entered of record in December, 1877, were in force, viz:

"1.   For each term of this court the clerk will prepare a calendar containing the causes and issues of fact to be tried by a jury, in which calendar all special assessment cases shall be first set down, and next all bastardy cases, after which shall be set down all causes noticed for trial, as hereinafter mentioned, in the order in which they stand on the general docket.   Said calendar shall be made up by the clerk on or before the Tuesday immediately preceding the first day of each term of this court, and a certain number of cases shall be set for trial for each day, until all cases on said calendar are assigned for trial.

"2.   Every original suit and every appeal case may be placed upon the trial calendar by filing with the clerk a written or printed request to that effect, on or before the Tuesday immediately preceding the first day of each term; and in no case shall it be necesary to serve a trial-notice upon the opposite party or attorney; and such causes shall stand for trial in their order upon the trial calendar, provided the issues are settled before such causes shall be reached for trial."

In pursuance of these rules, a trial calendar was made up for the September term, 1879, the case of Hewitt et al. v. McCurdy et al. appearing thereon as No. 277, and being set for trial for Tuesday, October 7th.   The call of this calendar was commenced September 8, and continued until November 14, 1879, the last case tried being No. 177.   A calendar of condemnation cases was made up for the November term, from which the court commenced calling November 17th, and continued to call until about January 29, 1880, when the call of the September calendar was resumed, commencing at No. 178. For the February term, 1880, a trial calendar was regularly made up, on which the suit in question appeared, and was set for trial for Tuesday; March 23d; but on February 6th, and

before the commencement of the February term, said cause was reached on the call of the September calendar, and tried in the absence of the complainants and their counsel, and a judgment rendered in favor of the plaintiffs therein for $840.50 and costs.

The counsel for the complainants watched the call of the September calendar until it was discontinued in November, and being familiar with the rules of the court, relied upon the assumption that the call of that calendar would not be resumed, but that a new calendar would have to be prepared before the complainant's suit would be subject to call. Ascertaining that none had been made up for the January term, and having no notice that the court had resumed, or intended to resume the call of the one prepared in September, he gave the suit no further attention, and neither he nor his clients were aware that it had been reached or tried until after the adjournment of the January term.

The bill alleges that the complainants had a good defense to the suit on the merits, and that by means of the proceedings aforesaid they were, without neglect or default on their part, prevented from interposing such defense at the trial. By way of setting out the character and nature of their defense, they allege that the only claim or demand for which said suit was brought grew out of the following facts:

For some four or five months prior to the 22d day of April, 1879, complainant McCurdy, was engaged in speculating on the Chicago Board of Trade by means of certain gambling contracts, nominally and in form, for the purchase and sale of grain, pork and other commodities, for future delivery at specified prices, but with the understanding and agreement between the parties to such pretended contracts, that nothing should be actually delivered by the sellers or received by the purchasers under such pretended contracts at the time stipulated for delivery, but that an account should be taken of the difference between the pretended contract price and the market price at that time of the same commodities on said board of trade, such difference to be paid by the person against whom it should appear to be; that such pretended contracts were entered

into by McCurdy at different times during said period, through said Hewitt, Bliss & Co., as his agents and brokers, they well knowing the true character, intent and purpose of such pretended contracts; that said deals or pretended contracts, amounting to between forty and fifty in number, involved the purchase by McCurdy of 8,750 barrels of pork, 80,000 bushels of wheat, 5,000 bushels of corn, and 250 tierces of lard, and the sales of a like quantity of the same commodities, such sales and purchases together aggregating in value over $400,-000; that in no one of said pretended transactions was any property delivered, or at any time intended or expected by the parties to be delivered by the seller or received by the purchaser, but in each case when the pretended deal was closed, Hewitt, Bliss & Co. rendered an account of the same to McCurdy, and charged or credited him, as the case happened to be, with the difference between the pretended contract price and the market price of the same commodities on the Board of Trade, and at the same time charged him a certain sum for their commissions for conducting such pretended purchase or sale; that on or about the 22nd day of April, 1879, Hewitt, Bliss & Co. claimed and demanded of McCurdy as the balance due them on the account made up of such differences and commissions, the amount sued for, and that such balance constituted the sole and only cause of action upon and for which said suit was brought and said judgment rendered. It is further alleged that complainant, Beveridge, was in no way or manner connected with said transactions or interested therein.

The remaining facts are sufficiently stated in the opinion of the court.

Messrs. Stiles & Lewis, for appellants; that the contracts in question were gambling contracts, cited Criminal Code, §§ 130, 131; Tenney v. Foote, 95 Ill. 99; Lyon v. Culbertson, 83 Ill. 38; Brua's Appeal, 55 Pa. St. 294; Kirkpatrick v. Bonsell, 72 Pa. St. 155; Pickering v. Cease, 79 Ill. 328; Grizenard v. Blane, 11 C. B. 526; Cassard v. Hinman, 1 Bos. 207; *In re* Chandler, 13 Am. Law Reg. 310; M. S. L. & T. Co. v. Goodrich, 75

Ill. 554; Bourke v. Short, 34 Eng. L. & Eq. 219; Gilbert v. Cook, 12 Chicago Legal News, 208.

The judgment is void and equity will afford relief: Mallett v. Butcher, 41 Ill. 382; White v. Washington, 5 Gratt. 645; Skipwith v. Strothn, 3 Rand. 214; Woodson v. Barrett, 2 H. & M. 80; Manning v. Manning, 8 Ala. 138; Finn v. Barclay, 15 Ala. 626.

Generally, as to the power of a court of equity to grant new trials: Saunders v. Jennings, 2 J. J. Marsh, 513; Gannon v. Fritz, 79 Pa. St. 303; Holloway v. Freeman, 22 Ill. 197.

While rules of court are in force they must be applied to all cases falling within them: Owens v. Ranstead, 22 Ill. 161; Burlington R. R. Co. v. Marchand, 5 Ia. 468; Hanson v. Mc-Cue, 43 Cal. 178; Ogden v. Robertson, 15 N. J. L. 124; Walker v. Ducus, 18 La. An. 703.

Messrs. PAGE & PLUM, for appellees; that these were not gambling contracts, cited Wolcott v. Heath, 78 Ill. 436; Corbett v. Underwood, 83 Ill. 324; Clark v. Foss, 7 Biss. 552; Pixley v. Boynton, 79 Ill. 351; Logan v. Musick, 81 Ill. 415; Hibblewhite v. McMorine, 5 M. & W. 465; Porter v. Viets, 1 Biss. 177; Lehman v. Strassberger, 2 Wood's C. C. 554; Bigelow v. Benedict, 70 N. Y. 202; Story v. Salmon, 71 N. Y. 420.

BAILEY, J. The jurisdiction of a court of chancery, where a proper case for its exercise is made out, to set aside a judgment at law and award a new trial, though once a matter of serious controversy, is now conceded and fully established. But before such jurisdiction should be exercised, it should be made to appear that the complainant has a good and meritorious defense, and that, without fault or negligence on his part, he has been prevented from availing himself of it by accident, mistake or fraud. In Walker v. Kretsinger, 48 Ill. 502, the court say: " The doctrine is well settled in equity, that when a party has a complete and adequate remedy at law, and fails from any cause to rely upon it in that forum, he will not be permitted to assert it in equity unless he was prevented by accident, or such circumstances as he was unable to control.

Beveridge v. Hewitt.

Any *laches* on his part in failing to assert his rights in a court of law when called upon to do so, will prevent him from obtaining relief in equity. If it appears that the judgment complained of is unjust, and that the party in good faith has used or endeavored to employ the means given him by the law to assert his rights, and has been active and vigilant in his efforts to make his defense, and is still prevented from presenting a meritorious defense, equity will grant a new trial at law." In Marine Ins. Co. v. Hodgson, 7 Cranch, 332, Chief Justice Marshall states the rule as follows : " It may safely be said, that a fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a court of law, or of which he might have availed himself at law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will justify an application to a court of chancery."

Were the complainants in this case chargeable with negligence in failing to present their defense in the county court? The answer to this question must depend in a great measure upon the force and effect to be given to the rules of practice of that court, and the degree of reliance the complainants were warranted in placing upon said rules in preparing and presenting their defense.

It is a well established principle that all courts of record possess an inherent power to adopt and establish rules of practice, subject only to the limitation that such rules are not unreasonable or contrary to the constitution or statutes; and when established such rules have the force of law and are obligatory upon the court itself as well as upon the parties to causes pending before it. While the court may at any time modify or rescind its rules, yet until it does so it should administer them according to their terms, and it can have no discretion to apply them or not, according to its convenience, unless such discretion is reserved in the rules themselves.

The terms of the County Court of Cook county commence on the second Monday of each month in the year, and that court in December, 1877, for the purpose of providing for the convenient and orderly disposition of causes pending before

it, adopted and entered upon its records rules requiring the preparation of a trial calendar for each term, such calendar to be made up on or before the Tuesday next preceding the first day of the term, and to be composed of causes in which at least one of the parties should file with the clerk a written request to place the cause on the calendar, and it was provided that causes should stand for trial in the order in which they should appear on such calendar.

So long as these rules remained in force they were the law of the court. It was not within the province of the court to enforce or dispense with them as convenience might dictate, and parties were warranted in relying upon their enforcement and governing their conduct accordingly. Were it otherwise, such rules, instead of simplifying and facilitating the business of the court, would become mere snares and traps for the feet of litigants. In this case, when the complainants' attorney ascertained that no trial calendar had been prepared for the January term on which this case appeared, but that the court instead of having such calendar prepared was engaged to a late period in the term in trying another class of causes, he had a right to assume that this suit was not in a situation in which it was liable to be called for trial before another term. Under these circumstances he was not called upon to watch the call of the calendar, and is not chargeable with negligence for failing so to do. Nor do we see that the situation of the case is at all changed by the fact that the court had already disregarded its rules to the extent of continuing to call from the September calendar until the close of the October term. Parties were not bound to assume that because the court had violated its rules to that extent, it would continue to do so still further, or to anticipate that near the close of the January term it would, notwithstanding its rules, resume the call of a calendar which it had abandoned more than two terms before.

In our opinion, then, the complainants were not chargeable with *laches* in failing to present their defense at the trial in the county court, but that such failure was due to circumstances for which they were not responsible, and over which they had no control; thus bringing the case, so far as the ques-

Beveridge v. Hewitt.

tion of *laches* is concerned, within the terms of the rule as above stated. It only remains to be seen whether the facts set up by the complainants in their bill and proved at the hearing, constitute a good defense upon the merits, so as to make it unjust and inequitable to execute the judgment.

The defenses are, firs that the alleged indebtedness for which the judgment was recovered, grew out of and was the result of certain unlawful and gambling transactions carried on by Hewitt, Bliss & Co. on the Chicago Board of Trade, as the agents and brokers of McCurdy; and, second, that as to all or the greater part of said indebtedness Beveridge was not jointly liable with McCurdy, but was an entire stranger to the transactions out of which the indebtedness arose. Either of these defenses, if made out, would be a good and meritorious defense, and would entitle the complainants to the relief prayed for in the bill. Let us consider the evidence bearing upon each in its order.

It is undisputed that said indebtedness was for the balance of an account in favor of Hewitt, Bliss & Co., growing out of a series of transactions on the Board of Trade, in which they acted as the agents and brokers of McCurdy or McCurdy & Beveridge, said account, with the exception of credits for certain moneys furnished Hewitt, Bliss & Co. for margins, being made up exclusively of credits and charges for differences arising out of the settlement of their various deals, and their commissions for conducting the business.

The evidence shows that Hewitt, Bliss & Co. commenced dealing for McCurdy about the 1st of January, 1879, and that between that date and sometime in April following, they took and closed out for him forty-four different deals. These deals were all in form contracts for the purchase or sale of wheat, pork, corn or lard, for future delivery, the period of delivery in each case being the first or second month subsequent to that in which the contract was made. In no case however was any of the property covered by these contracts actually delivered, but in every instance the deal was closed out by a counter contract in the form of a sale or purchase of the same commodity for the same delivery. These various deals amounted

in the aggregate to the sale of property of the value of over $200,000, and to the purchase of the same amount of property. In a number of instances the sale took place on the very day of the purchase; in others, two or three days intervened, and and in every case the deal was closed out long before the seller would have had a right by the terms of the contract to tender the commodity sold. Whenever in closing out the deals in this manner a profit was realized, it was credited to McCurdy, and whenever the transaction resulted in a loss, such loss was charged to him on the account.

As was said in Webster v. Sturges, 7 Bradwell, 560, " it is well settled that time contracts made in good faith for the sale for future delivery of grain or other commodity, are prohibited by neither the common nor statute law, and are in no respect repugnant to a sound public policy. Where it is the intention of the parties that the vendor shall deliver and the vendee receive the commodity sold, and there is no other element of illegality, either in the terms of the contract or its consideration, the contract is valid and binding, though the time of delivery may, within fixed and reasonable limits, be optional with one party or the other." The form of the contract, however, is by no means conclusive of the true nature of the transaction. That must be determined from the real intention of the parties. If it appears to be their intention that the property sold is not to be actually delivered, but that a settlement is to be ultimately made between them upon the basis of the difference between the contract and market price, it is, notwithstanding its form, a wagering contract, void at common law and prohibited by onr statute.

This doctrine has been repeatedly held by courts of the highest authority. Thus, the Supreme Court of Wisconsin, in a very recent case, holds that "Contracts for the sale and delivery of grain at a future day for a certain price, made with a *bona fide* intention to deliver the grain and pay the price, are valid in law ; but when such contracts are made as a cover for gambling, without any intention to deliver and receive the grain, but merely to pay and receive the difference between the price agreed upon and the market price at such future day,

they come within the statute of gaming, and are void in law. To uphold such contract it must affirmatively and satisfactorily appear that it was made with an actual view to the delivery and receipt of the grain, and not as an evasion of the statute of gaming, or as a cover for a gambling transaction." Barnard v. Backhous, 50 Wis.

In Grizewood v. Blane, 11 C. B. 526, 73 E. C. L. a leading case on this question, suit was brought to recover a certain sum of money, agreed to be paid by the defendant to the plaintiff in settlement of a contract between them, by which the defendant sold to the plaintiff certain railway shares for future delivery at a stipulated price. It was not disputed that the transaction was in form a contract of sale for future delivery, but it was alleged in defense that it was never intended that the shares should be bought and sold, but that the contract was merely colorable, and was in fact a mere wager on the price of the shares. It appeared that the plaintiff was a stock and share-jobber in London ; that the defendant had, through his broker, contracted to sell and to re-purchase the shares in the declaration mentioned ; and that there had been former dealings between the parties of the same character, no shares passing, but merely settlements of differences, according to the usual course of speculations upon the stock exchange. The Chief Justice left it to the jury to say what was the plaintiff's intention, and what was the defendant's intention, at the time of making the contract,—whether either party really meant to purchase or sell the shares in question ; telling them that if they did not, the contract was in his opinion a gambling transaction and void. The jury returned a verdict for the defendants, and on motion for a new trial before the full bench, the direction of the Chief Justice was held to be correct. In announcing the decision of the court, Campbell, J., said : " The jury were told that if neither party intended to buy or sell, it was no bargain, but a mere gambling transaction. I think that was the true question to leave to them. As to the evidence, I think it abundantly warranted the jury in coming to the conclusion that there was no real contract of sale, but that the whole thing was to be settled by the payment of

differences.  It clearly was a gaming transaction within the meaning of the statute."

The Supreme Court of Pennsylvania, in Brua's Appeal, 55 Penn. St. 294, following the case last cited, hold that a contract to purchase shares of stock without the intention to deliver or receive them, is a gaming contract.  See, also Yerkes v. Salomon, 18 Hun. 471; Bigelow v. Benedict, 16 Id. 429; *In re* John Green, 7 Biss. 338; Cassard v. Hinman, 1 Bos. 207; Kirkpatrick v. Bonsell, 72 Penn. St. 155.

This precise question arose in Tenney v. Foote, 4 Bradwell, 594, decided by this court.  In that case suit was brought against Foote as guarantor of a promissory note which had been guaranteed and negotiated by him to S. G. Hooker & Co., and by them assigned to the plaintiff.  The defense was that the consideration of the guaranty was an account of Hooker & Co. against Foote, growing out of certain transactions on the Chicago Board of Trade carried on by Hooker & Co. under and in pursuance of an unlawful agreement between them and Foote, whereby they undertook to trade for him in option-deals, in which neither party should be required to deliver or receive any of the commodities bought or sold, but which should be settled upon differences alone.  It appeared in evidence that prior to said transactions, Hooker & Co., who were members of the Board of Trade, agreed with Foote to deal for him on the board, with the understanding however that their dealings should be in options only, and that no property should be delivered or received on Foote's account, but that the transactions should be settled upon differences.  After making this agreement, Hooker & Co. dealt for Foote on the Board of Trade, such deals in all cases being in form purchases and sales of grain for future delivery.  These contracts, according to the usual method of dealing on the Board, were made by Hooker & Co. in their own name, with other members of the Board, and were from time to time communicated by Hooker & Co. to Foote as the same were made.  All of these contracts with one exception were settled by the parties thereto before the time of delivery therein provided for, by the receipt and payment of differences in price, the property embraced in one

Beveridge v. Hewitt

of said contracts being actually delivered to and received by Hooker & Co.    In the earlier part of the dealings, profits were realized and paid over to Foote, but afterwards large losses resulted, in settlement of which Foote indorsed and guaranteed four promissory notes, one of which was the note in suit.    These were held to be gambling transactions within the prohibition of Section 130 of the Criminal Code.    In the opinion it was said : " No matter what form the transaction bears as to the terms of the contract, still if such form be colorable only, and the real intention of the parties be that there is to be no sale of the article—no delivery or acceptance of it—but the transaction is to be adjusted only upon differences, it is a gambling transaction within the statute."    The opinion in this case, delivered by Judge McAllister at the trial in the circuit court and adopted by this court, was expressly approved by the Supreme Court on appeal.    Tenney v. Foote, 95 Ill. 99.

In the present case the dealings out of which the indebtedness in question arose were all, in form, contracts for the sale or purchase of property for future delivery.    What the real intention of the parties was, and whether the form was merely colorable, and adopted for the purpose of covering up a series of gambling transactions, must be determined from all the circumstances of the case as disclosed by the evidence.

McCurdy, at the time these dealings were being carried on, was a young man twenty-five years of age, entirely without property or financial responsibility.    He came to Chicago from Geneseo, Ill., about three years previously, and for the first year after his arrival served as clerk in the office of his father and Beveridge, his co-complainant, at $25 per month, and afterwards at $75 per month, and was receiving wages at that rate at the time these dealings were in progress.    He had never been in business except as clerk in the office of McCurdy & Beveridge, and was not, and never had been, engaged in buying or selling wheat, corn, pork, lard, or other like commodities.    Frank Bliss, one of the partners in the firm of Hewitt, Bliss & Co., had been acquainted with him for ten or twelve years and was, as it may be presumed, aware of his pecuniary cir

cumstances and business relations. When the arrangement was entered into between him and Hewitt, Bliss & Co., under which the dealings in question were carried on, no inquiries were made as to his resources or his ability to meet the liabilities which might be incurred on his behalf. Nothing was required of him beyond the deposit of a small sum of money, to be used as a margin on such contracts as they might make for him, and no provision whatever was made or even suggested for raising the money to complete his purchases when the time for delivery should arrive. Under these circumstances, and for such a party, these brokers, in the course of a little over two months and a half, purchased property amounting in value to over $200,000. None of it was for earlier than March delivery, and as the first purchase was made January 9th, and the last March 29th, the time for delivery had expired as to none when the last contract was made. It thus appears that all the purchases were concurrent, and had all been carried to the last day of delivery. McCurdy, for the last three days of March, would have had on his hands contracts for the purchase of this entire amount of property. To believe that either he or Hewitt, Bliss & Co. had any expectation or intention when these contracts were made that the grain purchased should be actually delivered or received, would require a stretch of credulity of which no man of common understanding would be guilty.

Neither of these brokers attempts in his testimony to claim that there was any such intention. The only fact bearing upon this question to which they testify is, that they, the brokers, had resources sufficient to enable them to receive and pay for the commodities purchased, and that they would have done so had a delivery been tendered. McCurdy, on the other hand, testifies that before the dealings commenced, he told Hewitt, Bliss & Co. that he should want to do some option trading, and that they said they would do the business for him. This is all the evidence in the record as to the terms of their employment or the nature of the business they undertook to transact. McCurdy further swears that he had no intention or expectation of taking or paying for the commodities pur-

chased or the means to do so, and that nothing was ever said to him by Hewitt, Bliss & Co. about receiving or delivering any of the property purchased or sold, although he was very frequently at their office while the business was in progress.

But perhaps the most significant proof on this subject is to be derived from the manner in which the business itself was conducted. Forty-four different purchases were made, and also the same number of sales, yet no property was in fact delivered or offered to be delivered. Instead of this, every deal was closed out long before the period of delivery arrived by a counter purchase or sale. This was sometimes done on the very day the contract was made, and usually within a very few days thereafter. Thus, January 18th there was a purchase of 500 barrels of March pork and also a sale of the same amount, closing the deal. In like manner, a purchase of 1,000 barrels of pork March 6th, and of 5,000 bushels of wheat March 13th, was made and closed out the same day. February 10th there was a purchase of 1,000 barrels of April pork and 10,000 bushels of March wheat, and two days later the deal was closed by sale. A purchase of 1,000 barrels of pork March 7th was cancelled by a corresponding sale the following day. February 20th 10,000 bushels of March wheat was purchased, and February 26th it was sold. These instances fairly illustrate the entire course of dealing. In every case a settlement was made upon differences, and the profit or loss charged to McCurdy. Neither he nor his brokers are shown to have been the owners of any amount of these commodities in which they were pretending to deal. None was present, so far as appears, either in bulk or by sample, nor did any of the parties claim to be the owners of warehouse receipts or other evidences of title to the property they were offering for sale. The inevitable conclusion is, that these transactions, so far as they purported or pretended to be actual purchases or sales of property, were merely fictitious; that there was no *bona fide* intention or expectation on the part of either purchaser or seller to deliver or receive the commodities purchased or sold; but that under the guise of transactions legal in form, the parties were really

dealing in options, to be ultimately settled on the basis of the differences in price.

The statute against gambling cannot be evaded by assuming the livery of legitimate commerce. It matters not how nicely the forms adopted may be adjusted to legal requirements, if the transaction, when stripped of its covering, discloses what is in substance a bet or wager on the future price of grain or other commodity, it is a gambling transaction within the meaning of the statute. In Brua's Appeal, 55 Penn. St. 294, Thompson, J., says: " Anything which induces men to risk their money or property without any other hope or return than to get for nothing any given amount from another, is gambling, and demoralizing to the community, no matter by what name it may be called. " It is the object of the statute to prohibit and punish unreal and fictitious transactions in grain or other commodities, where no actual transfer of property is contemplated, but only a final adjustment by the payment of differences. Such transactions, like other gambling, are alike destructive to legitimate commerce, pernicious in their effects upon those who may be induced to engage in them, and demoralizing to the community.

One objection however is made to the conclusion we have reached which will be briefly noticed. The contracts in question were made by Hewitt, Bliss & Co. with divers other members of the Board of Trade, and it is argued that even though Hewitt, Bliss & Co. may have intended to gamble, their contracts cannot be declared to be illegal, unless such intention was participated in by the other parties thereto.

It should be remembered that this suit is brought by the brokers to recover of their customer the balance of an account growing out of a series of transactions which were, so far as their acts and intentions could make them so, gambling transactions. The brokers were employed to deal in options, and they succeeded in carrying on a course of dealings which, in character and result, so far as they and their customer were concerned, was in precise fulfillment of their employment. We are far from being satisfied that, as between these parties, it is necessary in order to stamp these transactions with an

illegal character, to inquire into the intentions of the parties with whom Hewitt, Bliss & Co. dealt on the board.

But were this otherwise, we are inclined to the opinion that if these brokers rely for a recovery upon the fact that their intention to enter into gambling contracts was not participated in by the other parties thereto, the burden of proving such fact is upon them. It being shown that they intended to deal in fictitious trades, and all their transactions being in apparent keeping with such intention it will be presumed that all the parties to such trades entered into them with a like view, until the contrary is proved.

But the record is far from being barren of affirmative proof of the intention of the parties with whom Hewitt, Bliss & Co. dealt. It appears from the testimony of members of the firm that while by the rules of the board all contracts are made between the members in their own names yet it is the usual practice and course of business for the members, whenever it is possible, to settle up their deals as between themselves, by rings or counter-trades, and that most of their trades are settled in that manner, without the actual delivery or receipt of the commodities bought or sold. McCurdy, who claims to have some knowledge of the usual practice of the board, testifies that millions of bushels of grain are bought and sold in option trades where no delivery is ever made, and where the commodities bought and sold are never seen; that more pork is often bought and sold each day than there is in Chicago, and that it is never expected that a small dealer is to take the property purchased. None of these facts are contradicted by any witness.

Such being the general course of business on the board, participated in, as it must be presumed, by all the members, an intention to deal in accordance with such custom will be imputed to all who enter into transactions of this character. The business of the board being so organized as to facilitate fictitious transactions and settlements upon differences, a fair inference arises whenever a course of dealing is shown where one of the parties intends to settle in that manner, and carries such intention into effect, that his intention is participated in

by all the parties with whom he deals. In Grizewood v. Blane, *supra*, the Chief Justice, upon evidence far less satisfactory than that disclosed by the record before us, left it to the jury to say what the intention of both the plaintiff and defendant was in making the contract, and the jury having found that both parties intended to enter into a gambling contract, it was held that the verdict was abundantly supported by the evidence. In Tenney v. Foote, *supra*, the evidence as to the intention of both parties was very similar to that in the present case, and the finding of the circuit court that the contracts were gambling transactions, was sustained by both this court and the Supreme Court. We are of the opinion, then, that the defense that the indebtedness for which the judgment in this case was rendered grew out of a series of unlawful and gambling transactions, is fully sustained by the proof.

We are also of the opinion that the preponderance of the evidence bearing upon the defense that Beveridge was not jointly liable with McCurdy upon the indebtedness in question, is clearly in favor of the complainants.

Both McCurdy and Beveridge swear that Beveridge had nothing whatever to do with and had no interest in any of the deals, except that as to a purchase of 750 barrels of pork, he advanced to McCurdy $500 to be used by him as margins, and took an interest with him in that particular deal. The evidence on the other side is, that McCurdy on various occasions when Beveridge was not present, told Hewitt, Bliss & Co. that Beveridge was a partner with him in these transactions. They also testify that after the dealings were closed, a statement of the balance due them was presented to Beveridge, and that he said that it ought to be fixed up; that he would try and have it fixed up, and would see McCurdy and his father about it. It appears, however, that the account was kept by Hewitt, Bliss & Co. with McCurdy alone, and when presented to Beveridge it was made out against McCurdy individually. We are unable to see how Beveridge's statements when the bill was presented, can be construed into an admission of his own personal liability to pay it. It is also clear that the statements of McCurdy to Hewitt, Bliss & Co.

as to the fact of a partnership or joint liability made in the absence of Beveridge, cannot be considered as evidence against Beveridge, tending to establish such liability.

It follows, then, from what we have said, that a case for the interposition of a court of equity to award a new trial at law was clearly made out, and that the decree of the court below dismissing the bill for want of equity was erroneous.  The decree will therefore be reversed and the cause remanded, with instructions to the court below to enter a decree awarding the complainant a new trial at law, in accordance with the prayer of the bill.

Decree reversed.