**First National Bank of Stronghurst et al., Defendants in Error, v. Harry N. Vaughan et al., Plaintiffs in Error.**

**Gen. No. 7,581.**

1. FORECLOSURE OF MORTGAGES—*sufficiency of evidence to establish execution and validity of contract for additional security.* Evidence in a suit to foreclose a second mortgage on certain farm property

held sufficient to support a finding that a certain contract providing for the assignment to the mortgagee of a mortgage on other property of the mortgagor, to be held as collateral security for the payment of the entire indebtedness of the mortgagor to the mortgagee, was duly executed by the mortgagor and accepted by the mortgagee, and was a valid and binding agreement.

2. FORECLOSURE OF MORTGAGES—*sufficiency of evidence to impeach validity of recital as to amount of mortgage debt.* Testimony by the mortgagor in a suit to foreclose the mortgage that the amount thereof was read to him as $9,000 at the time he signed it was insufficient to impeach the validity of the mortgage recital that it was for $12,235.75, where the mortgage had been of record during the year or more prior to the institution of the foreclosure proceedings, and the same amount was recited as the amount of the mortgage in a contract executed by the mortgagor on the same date, and a copy of such contract was in the possession of the mortgagor from the date of its execution.

3. EVIDENCE—*requisite foundation proof for admission in evidence of ledger sheets of bank stating customer's account.* Proper foundation was laid for the introduction in evidence of ledger sheets of a bank showing the state of a customer's account by testimony of the cashier that the accounts were prepared and kept under his supervision, and that the entries therein were made from the original deposit slips and checks on the morning following each transaction and in the usual course of business, and that the same were true and correct.

Error by defendants to the Circuit Court of Henderson county; the Hon. WILLIS F. GRAHAM, Judge, presiding. Heard in this court at the October term, 1925. Affirmed. Opinion filed March 19, 1926.

MURPHY & KRITZER and O'HARRA, O'HARRA & O'HARRA, for plaintiffs in error.

HARTZELL & WERTS, for defendants in error.

MR. JUSTICE PARTLOW delivered the opinion of the court.

The First National Bank of Stronghurst, Illinois, A. E. Jones, the Bank of Galesburg and May Hunter Morgan filed their amended bill in the circuit court of Henderson county against Harry N. Vaughan and wife, to foreclose a second mortgage on 234 acres of

land, and to subject certain hotel property in Strong-
hurst to the lien of the mortgage. Cara D. Campbell
filed a cross-bill to foreclose the first mortgage on the
farm. Vaughan filed a cross-bill for an accounting of
the financial transactions incident to both mortgages.
The cause was referred to a master to take the evi-
dence and report his conclusions. Objections to the
report of the master were overruled and they were
renewed as exceptions. The exceptions were over-
ruled and a decree was entered dismissing the cross-
bill filed by Vaughan, and granting the prayer of the
amended bill, and of the cross-bill of Cara D. Campbell.
To review the decree a writ of error has been prose-
cuted from this court.

The evidence shows that Vaughan was a farmer and
stock breeder living with his family on the 234 acres of
land in question, about three miles from the village of
Stronghurst. In 1911, Vaughan commenced banking
with the First National Bank of Stronghurst and con-
tinued until February, 1923, during which time he de-
posited $467,894.64. From 1912 to 1921 he was a di-
rector of the bank and was on its discount committee
in 1915. He took part in the business of the bank in
auditing its accounts and signing statements. In 1920,
he erected a hotel in Stronghurst at a cost of about
$30,000. W. C. Regan sold Vaughan the furniture for
the hotel which was to be paid for in cash on delivery.
When the furniture was delivered Vaughan did not
have the money to pay for it and it was necessary for
him to put a mortgage on the farm. Regan suggested
that he might be able to get the money for Vaughan,
and Regan went to Oklahoma to see his stepsister Cara
D. Campbell, who agreed to make the loan. The mort-
gage and note for $22,000 were prepared by B. G. Wid-
ney, the cashier of the First National Bank; for con-
venience they were made to the bank, and on the same
day they were executed they were assigned to Cara
D. Campbell. All of the facts with reference to this

loan were known to Vaughan; he knew the mortgage for $22,000 was a first lien upon the land, and was in fact the mortgage of Cara D. Campbell.

Vaughan was indebted to the Pioneer Lumber Company and to Edward Kelly for material and labor used in the erection of the hotel. In May, 1921, Vaughan gave to Kelly two notes each for $2,191.80, and two notes, each for $2,532.35, to the Pioneer Lumber Company. These notes were given under an arrangement with Widney that security should be procured therefor. Vaughan then went to Texas and while there it is claimed that Widney procured H. A. Adair and Ralph Painter to sign, and Roy W. Park, Ed Stine, H. B. Fort, G. Q. Fort, Tom Dobbs and Seigworth Brothers to indorse two notes, each for $4,500, bearing date May 14, 1921, and payable to the First National Bank, which notes were to be held as collateral security for the notes given by Vaughan to the Pioneer Lumber Company and Kelly. Vaughan claims he knew nothing of this arrangement by which these notes were to be held as collateral security, and that the makers of these notes were induced to sign them because they, together with Vaughan, were members of the Hereford Association, an organization of breeders and raisers of full-blooded Hereford cattle, and that the notes were executed at Widney's request so that no steps would be taken to enforce a mechanic's lien against the hotel property by the Pioneer Lumber Company and Kelly. The evidence shows that when Vaughan returned from the west he told the persons who had signed these two notes for $4,500 that he would give them a mortgage on the hotel property as security therefor. In accordance with this arrangement a mortgage was given to Ralph Painter and G. Q. Fort, dated July 6, 1921, and acknowledged July 29, 1921, for $12,235.75. There is a dispute as to the amount of this mortgage. Vaughan claims it should have been for only $9,000, and was so read to him at the time he

signed it, and that he received no money on the mortgage, but it was simply given as security. At the same time the hotel mortgage was given, Vaughan gave to Painter and Fort a chattel mortgage for $33,500 on certain cattle and upon the furniture in the hotel. It is claimed that this chattel mortgage was given as security for the same indebtedness for which the hotel mortgage was given.

Vaughan executed six notes, payable to the First National Bank of Stronghurst, bearing date July 6, 1921, and secured by a second mortgage on the farm, which mortgage was acknowledged on July 29, 1921. These notes aggregated $24,253.75. One note for $1,000 was paid. A note for $917.80 was assigned to Mae Hunter Morgan. One note for $3,419.32 was assigned to the Bank of Galesburg, one for $3,204.13 was assigned to A. E. Jones, and one for $2,305.95 was assigned to Tom Morgan in his lifetime but was held by the First National Bank as collateral security for a note which Morgan owed the bank, which note was never paid. The mortgage securing these notes is the one sought to be foreclosed in this case.

On the same date these mortgages were given, July 29, 1921, a contract, which is known in this record as exhibit 10, was executed. This contract recited that Vaughan was indebted to the bank in the sum of $24,253.75, evidenced by six notes therein described; that to secure the notes Vaughan had executed to the bank a second mortgage on the 234 acres of land in question; that as additional and collateral security for this indebtedness Vaughan had executed to Painter and Fort his note for $33,500, which note was assigned without recourse to the bank which note was secured by a chattel mortgage on certain fixtures in the hotel and certain cattle; that as a further and additional collateral security, Vaughan had executed to Painter and Fort a note for $12,235.75, secured by a real estate mortgage on the hotel property; that the last two notes, with the

mortgages securing them, were expressly executed for the purpose of being delivered and assigned to the bank as additional and collateral security for the indebtedness due the bank; that when the indebtedness to the bank was fully paid, the notes and mortgages were to be surrendered to Vaughan and released, but if Vaughan did not pay the indebtedness to the bank then the two notes and mortgages were to remain in full force and effect as to the amount only of such portion of the indebtedness remaining unpaid; that the two collateral notes and mortgages were to stand as security for certain notes described as follows: two notes each for $2,532.35 to the Pioneer Lumber Company; two notes each for $2,190.80 to Edward Kelly; that the collateral notes were first to stand as collateral security to the signers of two notes dated May 14, 1921, each in the sum of $4,500, signed by Ralph Painter and H. A. Adair, said notes being indorsed by Roy W. Park, Ed Stine, G. Q. Fort, H. B. Fort, Tom Dodds and Seigworth Brothers, both of said notes being to the First National Bank; that subject to the above, the said collateral notes, and mortgages securing them, should stand as above provided as additional and collateral security for notes to the First National Bank. There is a controversy in the evidence as to whether this contract was signed by Vaughan, he claiming he never signed it.

It is claimed by Vaughan that in October, 1922, Vaughan, through Widney, collected a large amount of insurance on certain cattle which were burned, being the cattle covered by the chattel mortgage from Vaughan to Painter and Fort; that Widney paid the two Kelly notes and the two Pioneer Lumber Company notes out of this insurance money, and that the payment of these two notes discharged them; that this payment was made on October 16, 1922, as shown by the payments marked on the various notes; that part of this insurance money was also used for the payment

56        APPELLATE COURTS OF ILLINOIS.

First Nat'l Bk. of Stronghurst v. Vaughan, 240 Ill. App. 50.

of notes other than those described in exhibit 10, and
that there was no credit given on the hotel mortgage
although there was a credit on the chattel mortgage;
that the balance of the insurance money, amounting to
$6,562.23, was credited to Vaughan's personal checking
account by the bank. The hotel mortgage and note were
assigned by Painter and Fort to the First National
Bank, and it is claimed by Vaughan that the mortgage
was to be released when the Kelly and Pioneer Lumber
Company notes were paid, that they were paid, that
the mortgage should have been released, that it was
not released, that the parties went to the county seat
for the purpose of releasing the mortgage but did not
do so.

The amended bill alleged the giving of six promis-
sory notes by Vaughan to the First National Bank, the
payment of one note and the assignment of one of said
notes to each of the other complainants; that the mort-
gage was given by Vaughan on the 234 acres of land
to secure the notes, which mortgage was subject to a
prior mortgage given to the First National Bank and
by it assigned to Cara D. Campbell; that there was a
default in the payment of interest on the notes secured
by the second mortgage, and the principal thereupon
became due; that the wife of Vaughan had inchoate
right of dower in the farm and both had a homestead
right. The bill also alleged the giving of the note of
$12,235.75, by Vaughan to Ralph Painter and G. Q.
Fort, secured by the mortgage on the hotel property;
alleged an assignment of this note and mortgage to the
First National Bank; that the hotel mortgage was
given for the purpose of being assigned to the First
National Bank as additional and collateral security
for the notes secured by the second mortgage on the
farm. It alleged the execution of the contract known
as exhibit 10, evidencing the collateral security of the
hotel mortgage to the notes secured by the second
mortgage on the farm. The prayer was that the second

mortgage on the farm be foreclosed, and in case of a sale of the farm for an amount insufficient to pay the total amount due, that the property covered by the hotel mortgage be sold to satisfy any deficiency.

Vaughan and wife answered the amended bill; denied the execution of exhibit 10; alleged that there was nothing due the First National Bank; that Vaughan transacted business with the bank for a number of years, deposited large sums of money, sold the bank a number of promissory notes which should have been credited to his account but the bank failed to credit his account with the proceeds of the notes; that the bank, through its officers, drew checks against the account of Vaughan and depleted his deposit thereby, failed to keep proper accounts; that the bank was largely indebted to Vaughan in excess of the amount which he owed the bank, and that on a statement of account the bank would be found to be indebted to Vaughan; that any notes given by Vaughan, as alleged in the bill, were without consideration; that the other complainants, if they held notes signed by Vaughan, took them subject to the equities in favor of Vaughan against the bank; that Vaughan had no notice of such assignment until after the original bill had been filed.

Cara D. Campbell answered the original bill as amended, and alleged that she held a first mortgage upon the farm. She also filed an amended cross-bill which made new parties, and alleged the giving of a mortgage and note of $22,000 by Vaughan and wife to her which was a first lien upon the farm. It set up the second mortgage and prayed a foreclosure of the first mortgage.

Vaughan and wife answered the cross-bill of Cara D. Campbell, alleging that if a note and mortgage were executed which were a first lien that they were given to the First National Bank, and that Cara D. Campbell took the note and mortgage subject to the equities in favor of Vaughan and wife against the

bank; that on an accounting there would be found due to Vaughan from the bank a large sum in excess of the amount of the first and second mortgages.

Vaughan also filed a cross-bill in which he alleged that he had been a customer of the First National Bank and had great confidence in the bank and its officers; that he deposited more than $350,000 in the bank, and discounted notes, the proceeds of which should have gone to his credit; that the mortgages in question were for indebtedness growing out of the banking relations between Vaughan and the bank; that the bank was largely indebted to Vaughan, and that after deducting the amount of the indebtedness as shown by the notes secured by the mortgages, there was still due Vaughan more than $30,000; that the books of the bank were not honestly and fairly kept. He prayed for an accounting between himself and the bank.

The First National Bank filed an answer to the cross-bill of Vaughan and admitted the banking transactions; alleged that during a part of the time Vaughan was a director of the bank; that he attended the directors meetings, and that the transactions with reference to the notes of Vaughan were regularly audited and passed upon by the board of directors; that Vaughan had complete knowledge and was a party to all of the transactions; that he caused his indebtedness to become a part of the assets of the bank and caused statements to be made containing this indebtedness; that he used his office as a director in order to gain large credit; that he finally sold his stock in the bank and ceased to be a director; that the mortgages were taken in settlement of the differences between the bank and Vaughan; that the various notes of Vaughan were taken and renewed from time to time; that he had the canceled notes which were renewed, and was estopped to claim that the mortgage was not a legal asset of the bank; that during the time he was a director, the bank had a system of bookkeeping by which monthly state-

ments were furnished showing the amount of deposits and the amount of withdrawals by check, which statements were furnished to Vaughan monthly; that upon these statements was printed a request that if there were any mistakes, to call the attention of the bank to them at once; that these statements were acquiesced in by Vaughan; that at the request of Vaughan, the bank permitted three expert accountants to examine the books, and that they were ready to produce the books in court; that while a member of the board of directors, Vaughan voted for the legality of the loans which he had executed, and that he is estopped from claiming any fraud; that he was guilty of laches and was barred by the statute of limitations; denied that any notes were discounted which should have gone to his credit which were not credited; denied any indebtedness to Vaughan, and alleged the indebtedness of Vaughan to the bank to the full amount of the mortgage.

The decree found the facts as to the second mortgage as alleged in the amended bill, ordered Vaughan to pay the complainants in the original bill $27,969.43, which amount was subject to the first mortgage on the farm. Commissioners were appointed to set off the homestead as against the second mortgage. The decree further provided that if the land should not sell for enough to pay the amount due, then the hotel property be sold to satisfy the deficiency. A receiver was appointed for the farm, and the decree provided for a deficiency judgment against Vaughan in case the amount realized from the sale was not sufficient to pay the amount due on the second mortgage. The decree ordered Vaughan and wife to pay Cara D. Campbell $28,756.67, decreed a foreclosure of the first mortgage on the farm, and provided that in case of a deficiency judgment should be rendered against Vaughan for the same.

The first question for determination is whether or not Vaughan signed exhibit 10. He testified that he

did not sign it. Widney testified that he saw Vaughan sign it. Four witnesses testified they knew the signature of Vaughan, had seen him write, and that the signature was his genuine signature. On the trial Vaughan produced an exact copy of this contract which was not signed by him but was signed by Widney. He testified he got this copy from his files in the hotel where he kept his papers, he did not know how it got there, and he had never read it. Under this evidence the chancellor was justified in finding that the exhibit was signed by Vaughan. It was not signed by the First National Bank but was signed by Widney as cashier. Vaughan claims there was no evidence showing that Widney had authority to sign it therefore it is not binding. The body of the exhibit shows that it was a contract between Vaughan and the First National Bank. It was accepted by the bank, was acted upon by it, and was therefore valid and binding on both parties. By its terms the note and mortgage for $12,-235.75 were executed for the express purpose of being assigned to the bank as additional security for all of the indebtedness to the bank. For this reason Vaughan was not entitled to have the hotel mortgage released upon the payment of the notes for $4,500. He was only entitled to have it released after all of the indebtedness to the bank was paid, which was never done.

Vaughan contends that the mortgage on the hotel should have been for only $9,000 instead of $12,235.75 and that it was so read to him at the time he signed it. The evidence on this point is in practically the same condition as the evidence with reference to exhibit 10. Both were executed on the same day. The mortgage was signed by Vaughan and his wife. Exhibit 10 recites that the mortgage was for $12,235.75. All Vaughan says is that it was read to him as $9,000. His wife, who also signed the mortgage, did not testify. The evidence on the other side is that both the mortgage and exhibit 10 specified the correct amount of

$12,235.75. The evidence was not sufficient to impeach the validity of two written instruments, one of which had been upon record since August 18, 1921, and a copy of the other having been in the possession of Vaughan since the date upon which it was supposed to have been executed.

Vaughan offered in evidence his pass book showing his deposits. He did not offer that part of the book showing the credits due the bank. The bank offered the ledger sheets showing his whole account of both debits and credits. It is insisted that the books of the bank were incompetent because they were not books of original entry and proper foundation was not laid for their admission; that several persons making entries therein did not testify to their correctness although some of them were within the jurisdiction of the court; that the original memorandum, deposit slips and cash book were not offered.

J. F. McMillan, an assistant cashier of the bank, testified that he had been employed in the bank continuously since 1901; that during all that time the books had been under his supervision; that exhibit 26 covered Vaughan's account from April 1, 1917, to the time his account was closed; that it was made from the original deposit slips and checks on the morning following the transactions; that the books were balanced at the end of each day; that the entries were made in the usual course of business and were true and correct. There were only about two other witnesses who had worked on the book who were within the jurisdiction, and one of them was under quarantine and could not be present to testify.

Section 3 of the Evidence Statute [Cahill's St. ch. 51, ¶ 3] specifies the kind of preliminary proof necessary to admit a book account in evidence. In *Re Martine's Estate*, 233 Ill. App. 94, it was held that an ordinary desk pad used for memoranda is not a book account. In *Chisholm v. Beaman Mach. Co.*, 160 Ill. 101,

and *Bartolucci v. Dal Bianco*, 228 Ill. App. 113, it was held that the fact that entries made in a book are copied from slips of paper does not render the book incompetent on the ground that it is not a book of original entry. Where the record is made in due course of business and according to methods proven accurate by many years' test, it is competent. *Pittsburg, C., C. & St. L. Ry. Co. v. City of Chicago*, 242 Ill. 178; *Chicago & N. W. Ry. Co. v. Ingersoll*, 65 Ill. 399. Wigmore in his work on Evidence, after discussing cases within the exception, where it is impossible to produce the person who actually made the record says (vol. 3, 2nd Ed., sec. 1530) : ''The ordinary conditions of mercantile and industrial life in some offices do, in fact, constantly present just such a case of practical impossibility. Suppose an offer of books representing transactions during several months in a large establishment. In the first place the employees have, in many cases, changed, and the former ones cannot be found; in the next place, it cannot always be ascertained accurately which employee was concerned in each one of the transactions represented by the hundreds of entries; in the third place, even if they could be ascertained, the production of the scores of employees to attend court and identify in tedious succession the detailed items of transactions would interrupt and derange the work of the establishment, and the evidence would be obtained at a cost practically prohibitory; and finally, the memory of such persons when summoned would usually afford little real aid. If unavailability or impossibility is the general principle that controls, is not this a real case of unavailability? Having regard to the fact of mercantile and industrial life, it cannot be doubted that it is. In such case it should be sufficient if the books were verified on the stand by a supervising officer who knew them to be books of regular entries kept in that establishment.'' In *People v. Small*, 319 Ill. 437, on page 476, this rule was cited with approval, and it was held

First Nat'l Bk. of Stronghurst v. Vaughan, 240 Ill. App. 50.

that the cashier, whose function it is to oversee all transactions and test each through all its stages, is the person most competent to produce the books of a bank and vouch for their accuracy, and *Cooke v. People,* 231 Ill. 9, is cited [p. 478]. See also *Wait v. Wenks,* 186 Ill. App. 296. The books of the bank in question were established in accord with this rule and they were properly admitted in evidence.

The evidence shows that the books of the bank were balanced each day and found to be correct. Monthly statements were sent to the depositors showing the condition of the accounts. Vaughan admits getting some of these statements and he made no complaint. When his pass book was balanced, his canceled checks were returned to him with a request that he examine them for any errors but no errors were pointed out. For about nine years he was director, and at one time he was on the discount committee. He had a better opportunity than the average customer to keep track of his account. When this suit arose, he was granted permission on three occasions to have expert accountants investigate his account. Only minor errors were discovered which have been corrected. He only points out four or five instances in which he claims he was not given credit. The evidence shows that in each of these he was in error. As we understand the contention of Vaughan it is not claimed that the books of the bank, if they are correct and were properly admitted in evidence, show that the amounts found by the decree as due upon the two mortgages are incorrect. His contention is that the books were not correct and were improperly admitted. We think that neither of these contentions is true.

It is claimed that the cross-bill of Cara D. Campbell was not germane to the original bill; that the residuary legatees of Thomas Morgan were necessary parties before a decree could be properly entered; that the affirmative defense set up in the answer of Vaughan

required an amendment to the original bill and the cross-bill, which amendments were not made. Without going into detail with reference to each of these contentions, we deem it sufficient to say that we do not think there is any merit in any of them.

We find no reversible error and the decree will be affirmed.

*Decree affirmed.*