In re Estate of William R. Moorhouse, Deceased.
Dorothy E. Stull, Claimant, Appellee, v. Daniel J. Schuyler and Sybil Moorhouse Schuyler, Executors of the Last Will and Testament of William R. Moorhouse, Deceased, Appellants.

Gen. No. 32,317.

Opinion filed June 20, 1928. Rehearing denied July 7, 1928.

SCHUYLER, WEINFELD & PARKER, for appellants; WM. C. GRAVES, JOHN C. RICHERT and CARL J. APPELL, of counsel.

SONNENSCHEIN, BERKSON, LAUTMANN & LEVINSON, for appellee; J. B. HUGG, of counsel.

MR. JUSTICE ᵀAYLOR delivered the opinion of the court.

On April 16, 1926, Dorothy E. Stull, filed a claim for the sum of $14,750.00, in the probate court of Cook county, against the estate of William R. Moorhouse, deceased, and, on July 9, 1926, it was allowed in the sum of $10,646.20. An appeal was taken by the executors of the last will and testament of William R. Moorhouse, deceased, to the circuit court. In the circuit court there was a trial *de novo* before the court, with a jury, at which there was introduced in evidence on behalf of the claimant (hereinafter called Mrs. Stull), the testimony of Eugene L. Garey, Pearl Lillian Mordue, Julius Schwill, John E. May, and O. Ray Anderson; also certain exhibits.

At the close of the evidence on behalf of the claimant, Mrs. Stull, counsel for the executors moved the court to exclude from the consideration of the jury all the testimony, and instruct the jury to find the issues

in their favor. That motion was overruled. Counsel, for the executors then stated that they rested their case. Counsel for the claimant then moved that the jury be directed to find the issues for the claimant, Dorothy E. Stull, and to assess her damages at the sum of $10,783.21. That motion was objected to by counsel for the executors, on the ground that even if the contract in question was not on its face a gambling transaction, it still was a question for the jury to determine, under the facts and circumstances, and evidence introduced, whether or not the parties entered into the agreement for the purpose of carrying out a gambling transaction. The court overruled the objection and allowed the motion on behalf of the claimant, and, accordingly, on January 27, 1927, the jury, pursuant to the court's instruction, returned a verdict in favor of the claimant and against the executors in the sum of $10,783.21; and on June 25, 1927, judgment was entered against the executors in the total sum of $10,962.93, being the amount of the verdict, together with the sum of $179.72, interest thereon. This appeal is from that judgment.

The following is the theory of the claimant, Mrs. Stull: That some time in the spring of 1925, (Moorhouse died on August 17, 1925) she entered into a "deal" or contract with Moorhouse to the following effect: That from time to time she would get information from one Garey, a New York lawyer, (who had business relations with a certain dairy company and a so-called Nizer Corporation, and was general counsel for the original banking houses of both of those concerns), concerning the stocks of those companies; that he, Moorhouse, entered into "a joint account" with her in the purchase of some dairy and Nizer B stock; that (showing evidence of the contract or of a joint venture) Moorhouse told Garey, "I have agreed to put up half the money—I have agreed to put up the money —and buy these stocks, and share half the profits with

her"; that Moorhouse asked Garey about the companies, and he told Moorhouse as to their earnings, and that he was working on the purchase of certain other companies, and told him what the technical position of the stock was in the market; that he told Moorhouse who the purchasers of the stock were, and what individuals and banks were involved; that he answered a great many questions that Moorhouse asked him, and gave him all the information he could; that on April 1, 1925, Moorhouse bought, through his brokers in Chicago, with whom he had been dealing for many years, 500 shares of dairy company stock, at $52.00 a share, and through them thereafter, and prior to his death, bought various other amounts of dairy company stock and Nizer B stock, and also sold the same, and the profits on those transactions were approximately $22,000.00; that Garey talked to Mrs. Stull and gave her information concerning the stocks, and that she asked him, Garey, to inform Moorhouse, which he did; that he, Garey, gave Mrs. Stull information as to when to sell certain Nizer B stock; that some time in July or August, he talked to Mrs. Stull and told her that the dairy company stock had gone up fourteen or fifteen points, and advised her to sell at that price; that she asked him to give that information to Moorhouse, which he did; that on one occasion Moorhouse told him that he understood that Mrs. Stull was getting information from him, and asked him to confirm it; that he, Garey, repeated the information he had given her to him, and told Moorhouse that he would let Mrs. Stull know when, in his, Garey's opinion, the stock should be sold; that he gave no information to Mrs. Stull that he would not, under the circumstances, have given to anybody else who asked for it; that it was not confidential information; that what he gave out was, to some extent, a mere matter of opinion; that further evidence of the contract is shown by the testimony of the witness, Mordue, sister

of Mrs. Stull, to the effect that in May, 1925, she heard Moorhouse say, ''Dorothy and I have entered into a stock deal. I have some securities lying idle at my broker's and Dorothy was at that time and still is getting information from Gene Garey concerning the National Dairy Products Corporation stock, so we agreed sometime ago to enter into this stock deal together; I to purchase the stock and Dorothy to furnish the information when to buy, which we are going to obtain from Mr. Garey, and we are going to split the profits fifty-fifty;'' that in the latter part of July, she, Mordue, heard Moorhouse say to Mrs. Stull, ''You must get in touch with Gene. The stock is going up, and we want to know what to do;'' that her sister then telephoned to Garey in New York, and then told Moorhouse that Garey said the stock was going on up; that Moorhouse then said, ''All right, I am going to buy some more;'' that she then heard Moorhouse call up his broker in Chicago and order more stock; that on August 7, she heard Moorhouse say to Mrs. Stull that she had better call Garey on the long distance telephone and find out whether they had better sell then; that her sister got Garey on the telephone and then said to Moorhouse that she wished him to talk to Garey; that he did so, and after the conversation, he, Moorhouse, called up his broker in Chicago, and he said he was going to follow Garey's instructions, and sell the stock; that she heard Moorhouse put in a call for his broker, and heard him say, ''Sell me out at the opening of the market Monday morning;'' that she heard Moorhouse say, on one occasion after selling the stock, ''I am very glad to have made this extra money for my estate. I have lost rather heavily on other stocks;'' that further evidence of the contract is the testimony of one Schwill, who stated that Moorhouse said to him, ''Dorothy and I are in this deal 50-50. She gives me the information—gets it

from New York. I put up the financial end of it, and if there is money made, it is 50-50. If there is any lost, I take it."

Further, it is the theory of the claimant, Mrs. Stull, that between April 27 and August 17, 1925 (on which latter date Moorhouse died), he bought and sold various amounts of dairy and Nizer B stock upon information furnished by her, that one-half of the net profits which he made on such purchases and sales amounted to approximately $10,646.20, and that she was entitled to a verdict and judgment in that amount.

On the other hand, it is the theory of the executors, that there was no consideration for the alleged contract between Mrs. Stull and Moorhouse; that she neither had any confidential information concerning the stocks in question, nor was she in any better position to acquire it than Moorhouse himself; that the most that her evidence tends to show is that she referred him to Garey for information, who was a lawyer and broker in New York, and a very good personal friend of Moorhouse, and whom Moorhouse had known longer than he had known Mrs. Stull; that the only information of any value whatsoever that the record shows Moorhouse received was that received from Garey when Moorhouse visited Garey's office in New York, and on several subsequent occasions when Garey called up Moorhouse's summer home in Wisconsin; that the nature of the information Garey conveyed was testified to by him in the words, "It was no confidential information"; that Garey's evidence shows that he gave out the information which affected the rise and fall of the stock market, and in doing so was furthering certain banking interests; that he gave the information to people besides Mrs. Stull; that giving out the information was beneficial to his clients, because it broadened their market; that he relied on each one to tell his neighbor; that the information that Garey gave out was merely such information as a stock broker

would be only too glad to give to any prospective purchaser; that owing to the friendly relations between Moorhouse and Garey, it is a fair inference that Moorhouse could obtain any pertinent information concerning the stocks from Garey himself; that as a result, if Mrs. Stull referred Moorhouse to Garey for information, she thereby gave him no valuable information and rendered him no service whatsoever that would form the basis of any contract.

It is further the theory of the executors that there is no evidence that Moorhouse made any legal purchases of stock; that there is no evidence that Moorhouse made any use of the information in making any lawful stock deals; that the evidence tended to show that none of Moorhouse's purchases and sales of stock were bona fide investments, but mere gambling transactions, and being such, Mrs. Stull had no basis for any legal claim; that the evidence tended to show that the stocks were bought on a "margin" for speculative purposes; that no time was stated when the stocks were to be fully paid for and the account closed; that Moorhouse never asked for the delivery of the stocks; that they were never tendered to him; that the certificates were never made out in his name, but in the name of the broker; that they always remained in New York, and were never forwarded to Chicago; that when Moorhouse purchased the stock he paid nothing down; that the required margin on the stocks was charged to his general credit with his brokers; that when the stocks were sold, no money was paid to him, but the amount realized was credited on his indebtedness to his brokers; that these transactions were in no way separated from his general account; that the evidence tended to show that it was the understanding and intention of the parties that no deliveries were actually to be made, but that each purchase and sale was to be adjusted upon the mere settlement of the

differences; that at no time did either party have any intention of delivering the property to the other; that the question of intention was one for the jury and should have been submitted to it for determination.

We are of the opinion that, although no evidence was offered on behalf of the defendants—which arose, presumably, from the fact that Moorhouse was dead —all the evidence that was put in, that was competent, should have been submitted to the jury for its determination.

Counsel for the claimant urge that the uncontradicted testimony showed the existence of the contract, the performance of it and a profit resulting therefrom, and that that made out a case which with "all the legitimate and natural inferences to be drawn therefrom was wholly sufficient to sustain a verdict for the plaintiff."

It is true that in *Libby, McNeill & Libby v. Cook,* 222 Ill. 206, at page 211, the court said:

"A peremptory instruction for defendant should not be given, 'except where there is a substantial failure of evidence tending to prove the plaintiff's cause of action or to prove some material fact necessary to establish it,' " but in the instant case, the real question being considered was not whether a peremptory instruction for the defendant should have been given, but whether the evidence in the case was such that it ought to have been submitted to the jury for its determination. If the evidence, although all of it was introduced by the claimant, when reasonably considered, required weighing and balancing, and was not obviously free from doubt as to proving the cause of action alleged by the claimant, and suggested, as certainly some of its elements do, that what was proved as to buying and selling were gambling transactions, then it would seem to be necessary that the evidence should have been submitted to the jury, and that the

trial judge erred in concluding that he was entitled to weigh the evidence and direct a verdict without submitting it to the jury.

In *Kelly v. Jones,* 290 Ill. 375, Mr. Justice Cartwright said:

"There may be such inherent improbability in the testimony of a witness as to justify a court in disregarding his evidence even in the absence of any direct contradiction. If his testimony is contradictory of the laws of nature or universal human experience, so as to be incredible and beyond the limits of human belief, or if facts stated by the witness demonstrate the falsity of the testimony, the court is not bound to believe him. *Podolski v. Stone,* 186 Ill. 540; *Kennard v. Curran,* 239 id. 122; *People v. Davis,* 269 id. 256; *Kuehne v. Malach,* 286 id. 120.''

And in *Larson v. Glos,* 235 Ill. 584, the same judge said:

"It is true that a court or jury is not bound to believe a witness when, from all the other evidence or from the inherent improbability or contradictions in the testimony, the court or jury is satisfied of its falsity. * * * The witness in this case was not contradicted or impeached, and the facts testified to were not improbable in themselves or in connection with any circumstances in the case."

In the instant case, some of the essential facts which were testified to were, in and of themselves, highly improbable, and remained so even when taken in connection with other circumstances in the case.

In *Kuehne v. Malach,* 286 Ill. 120, Mr. Justice Carter said:

"While it is true the general rule is that positive testimony of a witness, uncontradicted and unimpeached either by positive or uncontradicted evidence, cannot be disregarded, it is also true that there may be such an inherent improbability in the testimony of the witness as to induce the court or jury to disregard

it, even in the absence of conflicting testimony. He may be contradicted by the facts he states as well as by adverse testimony, and there may be so many omissions in the account of the particular transactions, or in his own conduct, as to discredit his whole story."

In *Stephens v. Hoffman,* 275 Ill. 497, the same judge said, "there may be such an inherent improbability in the statement or testimony of a witness that the court may disregard it, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions or discrepancies in his testimony as to discredit him. *Quock Ting v. United States,* 140 U. S. 417; *Podolski v. Stone,* 186 Ill. 540; *People v. Davis,* 269 id. 256."

In *Kavale v. Morton Salt Co.,* 329 Ill. 445, at page 451, the court said:

"The jury is to judge the credibility of witnesses, and where the testimony of a witness has been disputed in a material matter or is inherently improbable, the jury is not required to believe such witness even though such contradiction of his testimony has not been direct."

It is frequently difficult to determine whether, as a matter of fact, a certain situation gives rise to a gambling transaction, or to a lawful contract; and it usually occurs because of the difficulty in determining, as a matter of fact, the intention of the parties. We think it is quite obvious that different reasonable minds might easily reach different conclusions, from the evidence set forth above, as to whether or not according to the law of this State, the transactions in question were lawful, or in the nature of gambling.

At the close of the trial, and after the executors had rested, the trial judge, in considering the claim of counsel for the executors that it was a question for the jury, said that the claimant had her theory of fact, and that it had been supported by a number of witnesses,

and that there was nothing to contradict it, and as a consequence, he would have to ask the jury to find for the claimant. We think, however, a careful analysis of the evidence—bearing in mind the law of this State concerning what constitutes gambling transactions— shows that there are such inherent probabilities that it was the intention of the parties not to buy and sell in what the law considers a legitimate way, but to accomplish a series of transactions, in their nature, as matters of pure hazard and gambling and to settle on differences, that to deprive the executors of their right to have the evidence submitted for the determination of a jury takes away and destroys their right of trial by jury as to controverted questions of fact.

In *Jamieson v. Wallace,* 167 Ill. 388, the court said, at page 396:

''It is well settled, that, where a contract for the delivery and sale of stocks or other property in the future is not made with the intention that such stocks or property shall be received or delivered but with the understanding, either express or implied, that the transaction shall be settled by the payment of the difference between the contract price and the market price at the time fixed, or at some future time, such a contract is a mere wager or gambling contract, and is void. *(Schneider v. Turner,* 130 Ill. 28; *Pope v. Hanke,* 155 id. 617, and cases there cited.) 'All contracts made between parties, who have no intention of receiving and delivering the property, but intend merely to settle accounts by the payment of the differences, are void and will not be enforced.' (8 Am. & Eng. Ency. of Law, 1005–1010). In order to invalidate the contract, it must appear that neither party has the intention to deliver the property, and that both parties have the intention of settling the differences only. But the intention of the parties in this regard may be established, not merely by their assertions, but by all the attending circumstances of

the transaction. The question of intention is a question for the jury or for the court, to be determined by a consideration of all the evidence. (*Pope v. Hanke, supra*). The intention of the parties in such cases may be determined from the nature of the transaction, and from the manner and method of carrying on the business. (*Irwin v. Milliar,* 110 U. S. 507; *Gregory v. Wendel,* 39 Mich. 327; 8 Am. & Eng. Ency. of Law, 1010; *North v. Phillips,* 89 Pa. St. 250; *Ruchizky v. DeHaven,* 97 id. 202; *Beveridge v. Hewitt,* 8 Ill. App. 467; *Griswold v. Gregg,* 24 id. 384; *Carroll v. Holmes,* id. 453; *Kennedy v. Stout,* 26 id. 133; *Miles v. Andrews,* 40 id. 155; *Pearce v. Foote,* 113 Ill. 228; *Brand v. Henderson,* 107 id. 141; *Tenney v. Foote,* 95 id. 99; *Cothran v. Ellis,* 125 id. 496).''

Further, as to the alleged contract between the claimant and Moorhouse, the evidence shows that he was a business man, a commissioner of public works of the city of Chicago, a man of property, and for twelve or fifteen years, at least, had been dealing in stocks, and held stocks to the amount in value of several hundred thousand dollars at a time; so that, notwithstanding the testimony of Garey, Mordue and Schwill, which is not contradicted, it appears as a highly improbable story and, as told, contains many inherent weaknesses. It is counter to ordinary and and conventional experience, so that, even though uncontradicted, we think the evidence should have been submitted to the jury. Whether the evidence proved that such a contract was ever made and whether the evidence showed that it was the intention of the parties to the purchases and sales to settle on differences, and to accomplish merely gambling transactions, involved matter of fact that should have been submitted to the jury.

The evidence is too voluminous to set forth here in such a way as to show fully the inconsistencies, discrepancies and cause for doubt that lead us to the

conclusion we have reached. We may say, however, that the testimony of Garey as to his employment and his relations with the banks and others, and his reasons for giving out information and how he got his knowledge, is by no means clear and so on its face is a source of perplexity, uncertainty and doubt, and, further, that the evidence as to the alleged contract between Mrs. Stull and Moorhouse deserved the scrutiny and consideration of the jury.

It is urged on the part of the executors that the trial judge erred in admitting incompetent evidence offered by Mrs. Stull; that the court permitted the witness Garey to testify to certain conversations he had with Mrs. Stull outside of the presence of Moorhouse. The testimony was admitted, apparently, on the theory that they were engaged in something in the nature of a partnership, or a joint venture, and, therefore, that a conversation of one partner was binding upon and admissible against the other. Apparently, from the allegations in Mrs. Stull's statement of claim, and from what she undertook to prove, she was to furnish Moorhouse certain information, which he might, if he saw fit, make use of in purchasing and selling stock in his own name, and that if, as a result of the purchases and sales, there was a loss, he was to bear it, and if it proved profitable, he was to pay her one-half of the profits. Evidently, that means that there was a simple contract between them, the consideration on her part being the furnishing of information. In our judgment, it was not a partnership, nor a joint venture. When he bought the stock, he bought it for himself and in his own name, and it was charged to his account, and she was not in any way a party to that transaction; and, likewise, when he sold any stock, the proceeds and profits were credited to his account only. All that she claimed under her alleged contract was the right to be paid a sum equal to one-half of the net profits, as payment for information

furnished by her. *Furber v. Page,* 143 Ill. 622; *National Surety Co. v. Winslow,* 143 Minn. 66; *Fougner v. First Nat. Bank of Chicago,* 141 Ill. 124; *Reed v. Engel,* 237 Ill. 628; *Grinton v. Strong,* 148 Ill. 587; *National Surety Co. v. Townsend Brick Co.,* 176 Ill. 156.

In our judgment, the testimony of the witness Garey, with regard to conversations with Mrs. Stull outside Moorhouse's presence was incompetent.

The contention on the part of the executors that the ledger of F. B. Keech & Co., the brokers through whom Moorhouse dealt, was inadmissible, is in our judgment untenable. The entries were made in the regular course of business, and their methods proved to be accurate by those having supervision of them when they were made. *First Nat. Bank of Stronghurst v. Vaughan,* 240 Ill. App. 50; *People v. Small,* 319 Ill. 437; *Pittsburgh, C., C. & St. L. Ry. Co. v. Chicago,* 242 Ill. 178; *Cooke v. People,* 231 Ill. 9.

Some contention is made on behalf of the executors that the trial judge erred in putting certain limitations on the cross-examination of the witness May, concerning other stocks besides the two in question, in which Moorhouse dealt. In our judgment, that contention is untenable.

For the reasons stated, the judgment will be reversed and the cause remanded for a new trial.

*Judgment reversed and remanded.*

HOLDOM, P. J., and WILSON, J., concur.