## The W. T. Rawleigh Company, Appellant, v. J. R. Ulm, Appellee.

### Gen. No. 8,528.

October term, 1931.
1932.

Heard in this court at the
Opinion filed November 9,

JESSE HEYLIN and BOYD, RATCLIFF & WEBER, for appellant.

CLAUDE E. CHIPERFIELD, BURNETT M. CHIPERFIELD and ROBERT B. CHIPERFIELD, for appellee.

MR. JUSTICE NIEHAUS delivered the opinion of the court.

This is a suit in assumpsit brought by the W. T. Rawleigh Company, appellant, in the circuit court of Fulton county against the appellee, J. R. Ulm, and S. M. White (who deceased during the pendency of the suit), to recover the sum of $877.72, claimed by the appellant company to be due under the terms of a credit renewal and guaranty contract alleged to have been executed by the appellee, Ulm, and S. M. White, now deceased, for J. E. Shawgo, a purchaser of appellant's goods and products, and delivered to the appellant company by Shawgo, for the purpose of obtaining further credit from the appellant company.

The guaranty contract referred to is as follows:

## "RENEWAL CONTRACT.

"1. This Contract made and entered into at the City of Freeport, State of Illinois, by and between The W. T. Rawleigh Company, an Illinois Corporation, hereinafter called the Seller, and J. E. Shawgo, of London Mills, in the State of Illinois, hereinafter called the Buyer:

"2. Witnesseth: Whereas said Buyer desires to purchase of the Seller, at wholesale, such of its manufactured Products as the Seller shall hereafter determine to sell to the said Buyer; the kind and quantity of which is to be optional with the said Seller;

"3. The Seller agrees to sell and deliver to the Buyer f. o. b. Freeport, Illinois, or at its option f. o. b. its branch houses or at any other point agreed upon, such of its Products as hereinabove specified and .at current wholesale prices, unless prevented by strikes, fires, accidents, or other causes beyond its control; the said Buyer to furnish signed orders for such goods.

"4. The Buyer agrees to pay said Seller the invoice price for all Products so purchased under this agreement, also any balance due the Seller at the date of the acceptance of this renewal contract, by cash, or by installment payments satisfactory to the Seller, subject to the discounts as shown in current Discount Sheets and subject to paragraph 6 hereof.

"5. The Seller will at its option also sell to the Buyer, a wagon or a body suitable for Auto Chassis, for cash, or partly or wholly on time, such as the Buyer may choose from the Seller's current Wagon Catalog, circulars, or other descriptions.

"6. It is hereby further agreed that either party may at any time before the expiration of this contract by written notice, terminate this agreement and when so terminated, the account then due and owing shall become immediately due and payable. If not so terminated, this agreement shall expire by limitation on the 31st day of December, 1922; and if Buyer refuses and neglects to renew Contract, the full amount due hereunder shall be due and payable promptly.

"7. It is further agreed that if dealings conducted hereunder are mutually agreeable and satisfactory, that a new contract may be entered into for the succeeding year, but the refusal on the part of the Seller

to enter into a new agreement shall not in anywise affect the agreement herein on the part of the Buyer to pay his account.

"8. Seller agrees to purchase from Buyer any Products (Wagon excepted) he may have on hand, and pay or credit Buyer with the wholesale price current when they are received, provided Buyer returns them during the life of contract or promptly after termination or expiration of same, and provided freight is fully prepaid to point Seller designates said Products are to be returned; Buyer to pay Seller the actual expense of inspecting and overhauling same.

"9. It is mutually understood that the Seller will furnish the Buyer from time to time with educational salesmanship literature, consisting of Rawleigh's Weekly, Guide Book, and other booklets, bulletins, circulars, leaflets and letters of advice and suggestions for the sole purpose of aiding and assisting Buyer in making sales and collections; but it is expressly agreed that nothing contained in any of the aforesaid literature, letters, booklets, bulletins, leaflets, etc., shall be taken in anywise to alter, modify, change or affect this agreement and shall only be considered as educational and advisory; and it is further expressly understood and agreed that any advice or suggestions contained therein is not to be considered by the buyer as orders, directions or instructions, nor in any way binding on him.

"10. And it is further understood and agreed by and between the parties hereto that this contract includes and does and shall constitute the sole, only and entire agreement between the parties hereto, and further that this Contract cannot and shall not be changed or modified in any particular whatsoever by any employee or representative of the Seller in any capacity, unless any such change or modification shall first be specifically reduced to writing and signed by both of

the parties hereto, and then any such change or modification shall only be effective after the corporate seal of the Seller shall have been duly affixed thereto.

"11. In Witness Whereof, the parties hereto have set their hands and seals, the Seller, in its corporate name by its President thereunto duly authorized, and its corporate seal hereunto affixed, and the said Buyer in his own proper person.

Accepted                    The W. T. Rawleigh Company
Jan. 2, 1922.                    By W. T. Rawleigh
                                              President

At Freeport, Illinois

(Signed) J. R. Shawgo (seal)
(Buyer Sign Here)

"For and in consideration of the sum of One (seal) Dollar to me in hand paid, and the receipt of which is hereby expressly confessed and acknowledged, or in consideration of the above named Seller extending further credit to the said Buyer, We the undersigned, do hereby jointly and severally guarantee unto said The W. T. Rawleigh Company, the above named Seller unconditionally, the payment in full of the balance due or owing said Seller on account, as shown by its books at the date of the acceptance of this Contract of Guaranty by the Seller, and the full and complete payment of all moneys due or owing, or that may become due or owing said Seller, and all indebtedness incurred by the Buyer under the terms of the above and foregoing instrument by the Buyer named as such therein, and to all of the terms, provisions and agreements contained in said instruments we fully assent and agree, hereby waiving notice of acceptance by the Seller, of this Contract of Guaranty, and all notice of any nature whatsoever, and agree that the written acknowledgment, by said Buyer of the amount due or owing on his account, or that any judgment rendered against him for moneys due the Seller, shall in every

and all respects bind and be conclusive, jointly or severally, against the undersigned. And we further agree that in any suit brought on this Contract of Guaranty by the Seller no other or further proof shall be required of it than to establish the amount or sum of money due and owing to it from the said Buyer, and when so proven, shall be conclusive and binding upon the undersigned, and further that it shall not be necessary for said Seller in order to enforce this Contract of Guaranty to first institute suit against said Buyer nor exhaust its legal remedies against him. And agree that any extension of the time of payment or payments to said Buyer shall not release us from liability under this Contract of Guaranty.

"It is hereby mutually understood and agreed that this Contract of Guaranty is conclusive and binding on the party or parties who sign it, whether the same is signed by any other party or parties or not, and that any statement or representation made by any person as to the undertakings of the guarantor or guarantors other than as herein expressed, or as to who or how many parties are to sign this Guaranty, shall in no wise affect the rights of the Company; and it is mutually understood that this is to be a continuing guaranty; and any notice in any way affecting the responsibility or liability of the signers hereunto in order to become effective and binding upon the above named Seller, shall be reduced to writing and delivered by registered mail to the office of said Seller, at Freeport, Illinois.

"Responsible men sign this Contract of Guaranty below.

| Names (Signed) | (Occupations) | (P. O. Addresses) |
|---|---|---|
| J. R. Ulm (Seal) | Farmer | London Mills, Ill. |
| S. M. White (Seal) | Farmer | London Mills, Ill." |

The appellant company's right of recovery is based upon a declaration which it filed in the case, con-

sisting of a special count declaring on the guaranty contract; also the common counts. In defense, the appellee and S. M. White, now deceased, filed the general issue; also a special plea averring that the contract was in conflict with the statute of frauds; and another special plea averring that the contract was without a valuable consideration; an additional plea verified by affidavits, denying the execution of the contract, was also filed. The case proceeded to trial, and at the conclusion of the evidence adduced and offered by the appellant company, on motion of the appellee the court directed the jury to return a verdict finding the issues for the appellee, which was done, and thereupon the court rendered a judgment in bar of the action. This appeal is prosecuted from the judgment.

A number of errors are assigned for a reversal of the judgment. Error is assigned upon the refusal of the court to admit the guaranty contract in evidence upon the objection of the appellee's counsel who insisted that there was no sufficient foundation laid for its introduction in evidence; nor sufficient preliminary proof concerning its execution by the alleged guarantors.

J. E. Shawgo, the principal debtor, testified concerning the execution of the guaranty contract, that he signed the contract which he sent to the appellant company; also that he procured the signatures of the two guarantors on the same. His testimony on this point is as follows:

"I formerly resided in Fulton County in the vicinity of London Mills. At one time I had some business transactions with the W. T. Rawleigh Company, plaintiff in this case. I think those transactions began somewhere in 1920. I am not sure. They continued a number of months. Those transactions consisted of traveling over the country selling products to farmers. The transactions carried on with the company itself

consisted of ordering the products which they kept. I sent orders to the company. Previous to the time I sent the orders, I signed a contract with the company. I signed two contracts. The instrument which has been marked for identification 'Plaintiff's Ex. 2' looks like one of the contracts; and the contract that I signed. I cannot say whether or not the signature, J. E. Shawgo, is mine. That signature looks like mine, but I cannot say that it is mine. I sometimes know my own signature and sometimes I don't. . . . There were guarantors on the contract sent to the company. John was on the first contract I had with the company. There were signers as guarantors on the other contract. They were Mr. Ulm and Mr. White. I wasn't sitting where I could see them sign it; but they took it and their names afterwards appeared on it. I wasn't with them when they signed it. I met Mr. White at his home. I was in the room where Mr. White was and he went to his desk and when he handed me the contract his name appeared on it. Mr. Ulm took the contract when he was in the drug store. He took the contract and I was talking with the proprietor, and directly Mr. Ulm came back, and the contract had his name on it. He was in the store during that time. I had a conversation with Mr. Ulm relative to his signing the contract. I had met him and told him my old contract had expired, and in order to do business with the company, I had to give them a new contract, as the old ones wanted to be released. I asked him if he would sign the contract with me. He said he would help me out. This conversation took place at the Santa Fe depot. We went from there to the drug store. Mr. Ulm went along. I delivered the contract to him, either on the street or I carried it over to the drug store. I had the same conversation with Mr. White. He said the same thing, that he would help me out. That occurred at Mr. White's store. I sent the

contract to the company after I had signed it and Mr. Ulm and Mr. White had signed it.''

J. R. Jackson, the general secretary of the appellant company, identified the guaranty contract as the one which the appellant company received from Shawgo after his first contract had expired in December, 1921; and under which thereafter the appellant company had shipped invoices for its goods and products upon orders received from Shawgo.

We are of opinion that the foregoing evidence was sufficient prima facie, for the admission of the guaranty contract in evidence. The appellant company had, however, adduced in addition thereto the testimony of witnesses familiar with the handwriting and signatures of Shawgo, Ulm and White, who testified that in their opinion the signatures were genuine. Shawgo also testified concerning orders for goods sent in to the appellant company after the contract had been executed and delivered to the appellant company, as follows:

''I continued to send in orders for goods after the second contract was sent to the company. I don't remember how long I continued. I quit the company, I think it was in August, about the first of August. I returned to them what goods I had left on hand. It was in August of the second year when the second contract was in force. I don't know how many different orders I sent to the company. I received goods from the company. . . . I received the goods that were sent me by freight over the railroad. They were shipped to London Mills. I received a statement monthly from the company of the account I had with the company. At the time the second contract was sent in to the company I owed a balance to the company. I don't know what that balance was. At the time of my discontinuance of business with the company I owed a balance to the company. I do not know

what that balance was. . . . I do not have any recollection as to the exact amount of the balance that is due and owing to the company from me. As near as I can recall it was between $600 and $800.''

Appellee's counsel moved to strike the latter answer of the witness concerning the amount due the appellant company ''because it did not appear that the indebtedness referred to by the witness was incurred under the declaration''; and the court sustained the motion and struck out the answer referred to. This ruling of the court was erroneous inasmuch as it appeared from the testimony of the witness that this was an indebtedness that accrued after the guaranty contract in question had been executed and delivered to the appellant company. ''Admissions of the principal debtor concerning the amount due are admissible against his surety or guarantor.'' Jones on Evidence (2d Ed.) sec. 238. 1 Elliott on Evidence, sec. 253. *Scovill Mfg. Co. v. Cassidy,* 275 Ill. 462; *People v. Title Guaranty & Surety Co.,* 156 Ill. App. 488.

We are of opinion that the refusal of the court to admit in evidence the ledger sheets containing the account of Shawgo, the principal debtor, was also error. The evidence shows the account was kept in the ledger by the appellant company in the usual course of its business with Shawgo; and concerned the goods and products of the company sold to Shawgo on the orders received from him. The preliminary proofs adduced as a foundation for the admission of the ledger sheets in evidence came within the requirements of the rule announced by the Supreme Court in *People v. Small,* 319 Ill. 437. See also *National Malleable Castings Co. v. Iroquois Steel & Iron Co.,* 333 Ill. 588, and *First Nat. Bank of Stronghurst v. Vaughan,* 240 Ill. App. 50.

The court's refusal to admit in evidence the invoices of the goods and products of the appellant company

shipped to Shawgo in compliance with orders from him, and which had been made out and verified regularly in due course of the business of the appellant company, was also error. It was not incumbent on the appellant company, as a matter of preliminary proof, to show that the guarantors had notice of its acceptance of the contract of guaranty as the notice of acceptance was expressly waived by the contract. Nor was it necessary as a matter of preliminary proof, to show the consideration for the contract. This was a matter of defense under the plea raising that issue. Moreover, the contract on its face showed the consideration.

The errors referred to vitally affected the appellant company's right of recovery and are therefore reversible; and the judgment is therefore reversed and the cause remanded.

*Reversed and remanded.*